and 21-30748 Barco. That's another one. Oh, Balsa v. Witte. So we'll hear first from In these consolidated appeals before your honors, my clients, citizens of Venezuela, one released from prolonged post-order immigration detention and were released from immigration detention. Ms. Gomez Barco spent over 16 months in post-order immigration detention. She fought her habeas case seven of the eight months that it was pending pro se. It was only when we came in the last month that she was able to win her case and get released from custody. Ms. Castro-Balsa had been in post-order detention nine months. Now they challenged the same judge's refusal to grant attorney's fees under the aegis statute. The judge found that the because of the extraordinary circumstances of the pandemic, a rapidly evolving pandemic, he said, and because of the breakdown in U.S. Venezuelan diplomatic relationships. An important point, your honors, is that neither party argued that position before the district court. Neither party had claimed that there was a, that the pandemic justified their position. In fact, as you see littered throughout the argument in the record in this case, the government said, the pandemic is not preventing us from removing people, and they argued the opposite. Now, post-order custody review always involves problems. When the government is not able to remove a person from the United States within those 180 days, there's always a problem. So to give the government a pass, because it was difficult to remove people to Venezuela at that time, is basically to give the government that an immigrant could never win attorney's fees under the aegis statute. Well, no immigrant has yet won attorney's fees, right? I mean, this is an awful, this is an awful argument on your part, isn't it? I'm sorry, your honor. Is it, I know this, the sound is weird today. I say, isn't this the first time that a court will be confronting whether immigrants can obtain attorney's fees under the EAJA? No, your honor. In fact, the Ninth Circuit routinely grants EJA attorney's fees and immigration cases are cited in our brief. And so, they're cited in our briefs, your honor, the Ninth Circuit regularly. Oh, I'm sorry. I reviewed the briefs a while ago and I missed that. So . . . Normally, we would be following the, you know, what another circuit has done, but every case depends on its facts, of course. Well, but the Fourth Circuit and the Tenth Circuit have confronted the same issue and said no, right? The, your honor, the Fourth Circuit, the Tenth Circuit first. In Ewing, your honors, and where now we're getting ahead to the, whether habeas is civil or criminal, the Tenth Circuit, your honor, determined in Ewing that because the underlying proceeding was, it was a criminal habeas, they said, well, it's clearly not really civil. But the court did not make any argument that the statute was ambiguous because of that. The court simply looked at kind of the DNA of the case. And, and if it's, if it's a cat or a dog, it might, it might be a cat that looks like a dog, okay? But you look at the DNA and it's a cat, it's not a dog, you know, and they looked at the DNA of the underlying case and said, okay, it's criminal. And, and I think it's interesting, your honor, because your, yourself and, and Judge Jones were on a panel evaluating 2255 and whether 2255 was civil. And in that case, you cited Johnston, I think it was. Here we go. It was in, in Ray-Lambton, 667, Fed Third, 585, in which your honor cited another Fifth Circuit case, U.S. versus Johnston, recognizing that 2255 proceedings, which are clearly criminal habeases, were nonetheless civil for purposes of the magistrate statute, that magistrates could hear those cases. But I, but I think that's what we really come down to on that side of the case, your honor, the, the Fourth Circuit decision on whether immigration habeas is civil or covered by the aegis statute as any civil action. In that case, the Fourth Circuit said that their conclusion was required by precedent, and the required precedent that they were looking to was O'Brien, and O'Brien was another criminal habeas. And so the DNA of O'Brien was criminal, and so the in distinguishing between what is civil and what is criminal, what is a civil action and what is not a civil action. Does it make a difference about, am I not correct here, that both of these ladies were, were held removable because they were, had both been convicted of crimes? Your honor, they, they had both been convicted of crimes, and the statute, the removal statute, provides a separate procedure. That is, that if the government wants to keep someone beyond the removal period because they are extremely dangerous but otherwise unremovable, there's a, there's a separate part of the, the regulations that the government has to follow to actually establish factually their dangerousness to the community in order to keep them out of their custody beyond the 180 days. And that's really not an issue in this case. Well, let me ask you just sort of a fundamental question. Now that you've, now that I am refreshed that there is a split in the circuits on this, how could the government's position ever be unreasonable for purposes of, even if the Equal Access to Justice Act applies, how could the government's position be unreasonable? Well, your honor, the, the government's position in this case, and it's, first of all, we're, we're both, as I pointed out, fighting about something that neither of us argued below. Okay. So the whole idea that the pandemic gives the government a pass. But in this case, your honor, there, there's no question. Both magistrates concluded, and the judge adopted those conclusions, those factual findings as his own. In, in Castro-Balsa, Magistrate Hannah said, the opinion offered by ICE officials in this and other habeas cases before this court is unbounded and should be rejected. Magistrate Whitehurst, who had already warned the government in her scheduling order, her scheduling order explicitly provided all affidavits shall be made upon personal knowledge and set forth such facts as would be admissible in evidence and shall, shall show affirmatively that the affiant is competent to testify to the matters. She concluded, she concluded neither of the officers had been offered as expert witnesses and the government had not provided evidence to establish that they have personal knowledge or competence to make the opinions that they offer in their declarations. So both of the magistrates concluded that the government basically failed to show up in court and bring any evidence to convince the court that these women should be, remain in custody beyond the 180 days. And this is particularly troubling, your honors, because we did present in our 28-J letter a study by Tuling Professor Marianek, who's here in the gallery today, that when the government does present evidence in habeas cases, this is at page 24 of her study, she studied 500 immigration habeas cases over the last 10 years in the Western District of Louisiana, where we have 6,000 immigration detention beds. Of those, in those cases, in 189 of the 205 cases where the U.S. attorney introduced evidence, that evidence was a sworn statement from an ICE official where the person signing the statement didn't have personal knowledge of the events. And so we're talking about something that is really an endemic problem. And it goes back to who has the evidence, who has access to the evidence to present. And in these cases, your honor, when you hit the 180-day mark under the post-order custody review that was implemented as a result of Zadvidus, jurisdiction over those decisions goes to Washington, D.C. So who did ICE bring to talk about the problems of removing people to Venezuela, the U.S. Venezuelan breakdown in diplomacy, the pandemic? Who did they bring? They brought low-level deportation officers from Oakdale, Louisiana, who had no idea what was actually happening in Washington, D.C. But at the end of this case, and this is extremely telling, is that in the IJA motions, the government brought Jane Aska. And her declaration, your honors, is in the record. They brought her a day late and a dollar short, or 180 days late. And how many dollars short? You're asking for fees. No, more than that. So, but in her declaration, she shows that she is the liaison for ICE ERO with the government of Venezuela concerning repatriation of Venezuelan citizens and nationals who have already been removed, ordered removed from the United States. So the lady who had her finger on the pulse of what was happening, they could have brought her. And it's kind of interesting, if you look at her declarations, it's actually styled under the Middle District of Georgia. So they kind of, she's apparently appeared in other cases. But it's very clear that the government could have brought a competent witness. They did. They failed to do so. And the court took them to task for it. Well, let me, I mean, I don't, explain to me, it says the government submitted two additional sworn declarations by Ladwig. Ladwig stated that the removal date was then scheduled for April 9, 2021. And in the second one, he stated that she was manifested aboard a removal charter flight No, Your Honor. And they did quite honestly, you know, they removed her. But in late April, and that's not in the record, Your Honor. But she's my client. I thought that was in your brief somewhere. Well, it's the fact of her removal is really irrelevant. But by the time she was removed, she would have been in immigration custody for almost two years. Okay. Post-order custody for two years. And the whole point of Zedvidus was that, hey, there is a limitation on post-order custody. The constitutional interest of liberty get triggered at that point. And once we brought sufficient evidence and we brought an expert, U.S. renowned expert in Venezuela relations to explain that these removals weren't going to happen in the reasonably foreseeable future, given that we were already way, way past the 180-day mark. So, Your Honors, on the one hand, we have in the habeas side of the case, whether habeas is civil or criminal, you have a truly marginal outside decision by the Fourth Circuit that felt bound by its precedent. And you've got 150 years of cases, the Second Circuit and the Ninth Circuit clearly finding that. And other three circuits just assume it, that immigration— Well, but you have the additional component that waivers of sovereign immunity are strictly construed, and that often plays into the case law. I realize that you have in your favor the plain wording of the statute. Well, as the Supreme Court pointed out, and I'm beyond my time, but I'll respond to your question. As the Supreme Court pointed out in Richland, where there's an ambiguity, that canon of construction for sovereign immunity comes into play. And so the first question is whether there's any ambiguity when Congress said any civil action, the prevailing party, if they meet all the requirements, should be ordered attorney's fees. And in this case, the policy implications of this are just enormous, as Professor Yannick's study shows. But the sovereign immunity argument really is a red herring in this case. It was only brought up in the Fourth Circuit. Thank you, Your Honor. Okay, you have a chance for rebuttal. Thank you. Yes, sir. Ms. Grant. Good morning, Your Honors. May it please the Court. Nicole Gray on behalf of the government. There are two issues currently before this Court. First, whether equal access to the Justice Act or EJIA fees are available to petitioners in habeas corpus proceedings. Second, should this Court find that they are, whether the district court abused its discretion in denying habeas fees to the petitioners in these cases after finding that the government's position was substantially justified. The answer to both those questions is no. As an initial matter, a court may not grant fees against the United States government absent a clear and unequivocal waiver of sovereign immunity. As it pertains to habeas corpus proceedings, Congress has not expressed a clear and unequivocal waiver of sovereign immunity to allow for the recovery of fees in habeas corpus proceedings. The district court also did not abuse its discretion in determining that the government's position was substantially justified in these cases. But it says any civil action, right? Yes, Your Honor. The government concedes that the statute says any civil action. Any, of course, the government would concede being read expansively. However, any cannot be read in a vacuum and must be read in conjunction with the words that follow it, civil action. And the term civil action, as it pertains to habeas corpus proceedings, is, as many courts have found, ambiguous. Well, of course, our court has repeatedly said that a habeas matter is civil. Let me give an example that most people may not be aware of because they're usually unpublished opinions. But we routinely have issues with untimely notices of appeal from pro se litigants in habeas cases. And we have, I haven't counted how many cases there are. My guess is that there are hundreds. But in any event, mostly unpublished, as I said, that say that the time period for filing a notice of appeal in a habeas action is the civil time period, which is 60 days if it's the United States as a party, as opposed to the 14 days, which it would be for a criminal action. And just about every time we do that, we repeat the statement that habeas actions are civil. Well, in U.S. v. Johnston, this court noted that habeas motions are hybrid in nature, that they contain both civil and criminal characteristics. The Supreme Court in Harris also specifically noted that framing habeas corpus proceedings as solely civil in nature is grossly inexact. Habeas corpus proceedings are hybrid in nature. They contain both civil and criminal characteristics. Let me point you to Heflin v. United States. That's the Supreme Court. It's an old case. It's 1959, but in which the Supreme Court said a petition for writ of habeas corpus is not a proceeding in an original criminal prosecution, but is an independent civil suit. The government accepts Your Honor's explanation of that case, but points the court to the Supreme Court case in Schengler and the Supreme Court case in Browder, both cases habeas corpus petitions, where the court found that standard civil procedure processes do not apply. The rule, I mean, the rules of civil procedure clearly are, there's a special rule that allows courts to dismiss a habeas petition on its face, right? That's a friendly question. Yes, Your Honor. Unless it clearly, unless it clearly appears from the petitioner's allegations that there is no possibility of relief, that there is a possibility. Yes, Your Honor. Habeas corpus proceedings are not solely civil actions. They are hybrid. There are numerous cases before the Supreme Court and the case before this court where the court has specifically noted that they are hybrid, and that's important because for waivers of sovereign immunity, the statute must be strictly construed, and any ambiguity found in the terms of the statute must be viewed in favor of the sovereign of the United States government. And so if this court determined that the term civil action as it pertains to habeas corpus proceedings is ambiguous, it must then find that habeas corpus proceedings do not allow for aegypti recovery. The court, looking at the Second Circuit's decision in vacuo, this court should not follow that decision for many reasons, chiefly being that the vacuo court did what the Supreme Court said not to do in lane, which is look at the legislative history, look at something outside of the plain statutory text to determine whether or not a waiver of sovereign immunity exists. Vacuo implied its own waiver of sovereign immunity. You juxtapose that with what the Fourth Circuit did in Obando-Segura, looking at the plain language of the statute and determining that because the term civil action itself is it doesn't necessarily matter that it is any civil action. Any of an ambiguous term remains ambiguous. Plaintiffs argue that habeas proceedings should be handled differently in the immigration context versus the criminal context, but there is no different statute or separate statute for writs of habeas corpus for immigration than there is for criminal. There is just writs of habeas corpus. Further, the Supreme Court in Damaya noted that, as this court pointed to earlier, the the connection between criminal and immigration has become increasingly more common. There are many times the underlying reason why individuals are in immigration detention is because of criminal activity. Both petitioners in these cases were convicted criminally, served criminal terms, and were transferred into immigration custody because they were non-citizens. So, yes, your honors. Importantly here, it's just very important to note that there can be no agency recovery absent a waiver of sovereign immunity, and this waiver cannot be based on the clear language of the statute. It must be clear and unequivocal, and there are sufficient cases both before this court and before the Supreme Court that draw into question whether or not habeas corpus proceedings are solely civil. As the Supreme Court noted in Harris, there are many cases in the court the government concedes where habeas corpus proceedings have been that's more for convenience purposes. It's grossly inexact to call a habeas corpus proceeding solely civil, and the EJ is clear that it covers civil actions, not hybrid actions, not actions that have been deemed not civil for other purposes, as the Supreme Court has deemed habeas in Schlangler and Browder, as this court noted in Johnston, but solely civil actions. If the court has no further questions. Browder said that habeas corpus is a civil proceeding, right? That's what Browder said. Browder said that habeas corpus proceedings do not follow the civil process of motion to dismiss, answer, discovery. It says that it's not a civil proceeding because it does not follow the standard federal rules of civil procedure. I'm looking at a quotation from Browder, quote, habeas corpus is a civil proceeding. Yes, Your Honor. As noted in Harris, there are cases as Browder where the court might say that they are habeas proceedings, but Browder also said that they are not habeas proceedings for purposes of how they should be treated. They do not follow the standard civil process, and sole civil cases follow the proper standard of civil process. Now, are you going to tell us about substantially justified? Absolutely, we can definitely get to that. So, the government would just wrap up that argument by saying that, as the Supreme Court found in Steele Company, this is a threshold issue and one that the court must decide before turning to substantial justification. And because there are no sufficient cases in which this court in Supreme Court has noted that habeas corpus proceedings are not solely civil, they do not fall squarely within the plain language of the aegis statute, and petitioners should not be able to get aegis fees in habeas corpus proceedings. Moving to the second issue before this court, whether or not the government's position was both were in immigration custody following criminal convictions. The government obtained travel documents for both petitioners. The government provided numerous declarations to the court explaining, in opposition of what plaintiffs or petitioners counsel has said, that the COVID-19 pandemic was causing exigent circumstances that were delaying their removal. There's ample evidence in the record that establishes that the government argued that COVID-19 pandemic had an impact on the removal of these petitioners. Let me just, I'm quoting Mr. Mayo, your opposing counsel, and what he said at the beginning of his argument today was, wrote it down pretty exactly, he said, neither party said that the pandemic prevented removals. Is, is that, do you agree with that representation of the record? I do not, your honor. I believe that is a mischaracterization of the record. There are multiple declarations and argument and filings before the district court where the government argued that the COVID-19 pandemic, the closed airspace, these things had impact on the government's ability to remove these petitioners. Yes, your honor. So the government obtained travel documents for both of these petitioners and the delay in their removal was because of the COVID-19 pandemic. Both petitioners received the standard pokers or post order custody evaluations, and it was determined that their continued detention was necessary. But it cannot be said that the government's position below was not substantially justified because the government was not taking any action to delay these petitioners removal COVID-19 and the unpredictable nature of it is, as we all know, your honors simply delayed their removal. But the record establishes that, um, that removal was possible. In fact, Ms. Barkow was removed from the United States. And so any argument that the government, you know, obtained false documents, any argument the government could not have removed these individuals is just plainly false, your honor. The court doesn't have any more questions. I don't think so. I think the briefs pretty well explain the issues also, even though I misspoke at the beginning. Thank you so much, your honor. All right. The government would ask that this court first find that Equal Access to Justice Act fees are not available to petitioners in habeas corpus proceedings because the term civil action is ambiguous. The statute must be strictly construed in favor of the government, and it should be found in accordance with what the Fourth Circuit found in Bando-Sagura, that fees are not available. And as much as this court might find that fees should be available, this court should still affirm the decision of the district court in both cases because the government's position throughout was substantially justified. Thank you so much for your time. Thank you very much. All right, Mr. Mayhew. I wish I could take up some of counsel's extra time because I'd love to get deeper into it. But just briefly, first on the civil side, we cited Richland. Richland says that the sovereign immunity strict construction is just one tool within the canons of construction of statutes, and you first have to decide whether the statute is ambiguous. And it is a broadly worded statute. In another canon of construction, which Richland instructs the court should also consider along with the sovereign immunity construction, is that a statute is to be construed in the light of the purpose of the statute. And the aegis statute explicitly says what its purpose is. Its purpose is to remove financial deterrence to those challenging government actions and to encourage challenges to improper government actions and help formulate public policy. And so if you construe any civil action in the light of these challenges to improper government action, and if you look at the DNA of this case, it's civil. It's civil. It's civil. Why is this more civil than a person who's in a federal detention, you know, federal correctional jail and files a habeas? Are you trying to draw a distinction between the criminal conflict under federal law or state habeas and your clients? Your Honor, my, you know, our case is clearly within the lines of civil-civil, okay? There is this whole world of criminal habeas, and a couple of courts have said, hey, you know, this thing underneath, it meows, you know, even though it's got some dog characters to it, and so we're going to say it's outside of aegis because it's not clearly civil. But in this case, these proceedings are clearly civil, and to interpret the statute— Well, when you say clearly civil, I mean, did you proceed under the federal rule that I did? We did, Your Honor. And that federal rule says that the court can . . . that they're not standard two-party cases, that the court doesn't even have to request a response on the part of the government unless it finds that there is some, you know, material fact issue or something like that. I mean, so this case proceeded under the general—the rule that is specific to habeas, whether it is detention—whether it is immigration detention or criminal detention. Well, and I think that when we look at the procedural access—the procedural part of the case, first of all, the habeas statute does otherwise incorporate some of the rules of otherwise applied strictly within the habeas statute. Well, because they don't get—you know, the defendant doesn't get—the defendant, quote, the plaintiff in the habeas case doesn't get to undertake discovery normally. Correct. Correct, Your Honor. It's all bound by the record, as it is here. As it is here, Your Honor, and that's very true. Your Honor, just briefly on the but the government raises this issue of—that they were able to obtain travel documents for both of these women, and we raise this issue below because we have these dueling governments in Venezuela. The United States recognized Juan Guaido as the legitimate leader. Maduro was in issued by the Guaido embassy in the United States, where they were like worthless pieces of paper. I could have no more gotten into Venezuela with my Louisiana driver's license than anyone who got one of these Guaido pieces of paper. And that was very clear and set out in Dr. Goldfrank's testimony. And this is part of the problem of this case, of all of these habeas cases, that the government is always in control of all of the evidence. And it took a Herculean effort in this case to get an expert to come in and explain how bad this was and what a farce it was that the government was presenting these false documents in order to say that they were—these people are going to be removed because we have TDs. TDs are immigration travel documents to remove them from the country, but they were invalid travel documents. Well, what do you say about the COVID argument? Okay, the COVID argument goes back to this. Post-order habeas always involves problems. And if we give the government a break because there were problems, then people would be detained forever. And that's why Zidvitis was passed. You know, we used to keep Cubans— But COVID was not an extraordinary problem. Is that right? Well, it's always an extraordinary problem that prevents someone from being removed from the United States. Well, then, according to your argument, the government would be paying out fees right and left because— Well, the government could do what they did in this case. In hundreds of Venezuelan cases, they released them. And what about criminal cases? Do you draw a distinction between civil and criminal habeas cases? Because occasionally people get habeas relief. In federal, you know, from criminal— Well, it's not really germane to this case. No, it is very germane to how you interpret the statute. If habeas is civil, if the plain language of the statute is to be followed, and habeas is everywhere and always civil— I mean, just to take an example out of the press, although I agree, I know it's controversial, you've got a couple hundred fellows incarcerated in the D.C. jail for nearly two years now, in many cases, who've never gone to trial because they were present in the Capitol on January 6th of 2020. Now, let's assume that at some point— I don't understand why they're still there because some of them— let's assume that some of them are only liable for trespass or a misdemeanor offense, which the time for incarceration— So anyway, let's assume that a few of them get— file 2255 habeas and get out. Government pays fees to them if it's not substantially justified? Well, Your Honor, under Your Honor's decision and under the Fifth Circuit decision in Johnston, those actions would be considered civil. Okay, that's all I wanted your opinion on. Thank you, Your Honor. All right, thank you very much. Thank you.